# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 18, 2013 Session

## MARGIE R. HUSKEY ET AL. v. RHEA COUNTY, TENNESSEE

**Appeal from the Circuit Court for Rhea County**
**No. 24382     Thomas W. Graham, Judge**

---

### No. E2012-02411-COA-R3-CV-FILED-SEPTEMBER 10, 2013

---

In this negligence action, the trial court, following a bench trial, found the defendant 51% at fault and the plaintiff 49% at fault for a severe injury plaintiff, Margie R. Huskey, suffered to her left arm at the Rhea County Convenience Center. The trial court assessed total compensatory damages at $298,376.65, which it reduced by 49%, awarding $152,172.09 to Ms. Huskey. The court further assessed damages of $25,000.00 for loss of consortium in favor of plaintiff, Norman Huskey, which it likewise reduced by 49%, awarding $12,750.00. The County raises three issues on appeal: (1) whether the trial court erred by finding the County liable for negligence; (2) whether the injured plaintiff was at least 50% at fault and therefore barred from recovery; and (3) whether the damages awarded were excessive. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and JOHN W. MCCLARTY, J., joined.

Arthur F. Knight, III, and Jonathan Swann Taylor, Knoxville, Tennessee, for the appellant, Rhea County, Tennessee.

Howard L. Upchurch, Pikeville, Tennessee, for the appellees, Margie R. Huskey and Norman Huskey.

# OPINION

## I. Factual and Procedural Background

The personal injury giving rise to this action occurred on October 6, 2004, when Ms. Huskey drove her pick-up truck, loaded with discarded items from her attic, to the Evensville Convenience Center ("Center"). Ms. Huskey was fifty-three years old at the time. The Huskeys had lived in close proximity to the Center for several years and had taken their household refuse there weekly. Ms. Huskey arrived at the Center about a half-hour before closing time. She was waved through the gate to the gravel parking lot by longtime attendant and operator, Quencie Ebitt.

The facts surrounding the accident are for the most part undisputed. Acting on Mr. Ebitt's directive signal, Ms. Huskey drove past a recycling bin, a compactor, and a shed to reach a large dumpster used for items too large for the compactor. The dumpster, which was approximately eight feet tall, rested on a concrete slab. The slab sat approximately three feet below the level of the gravel lot. As Mr. Ebitt testified, the purpose of this placement was for patrons to back their vehicles toward the dumpster on the gravel lot and place refuse into the top opening of the dumpster, which container had no side openings. This process required patrons to either throw their refuse in the opening approximately five feet above where they were standing on the gravel lot or place the items in the opening from an elevated position by standing on their truck beds. The dumpster was flanked by the Center's fencing on two sides, the gravel lot on one side, and a concrete slab on the remaining side. The concrete slab was not designed for patrons to access the dumpster.

A constructed cinder-block wall extended up from the concrete slab, separating the dumpster from the gravel lot. Along the center of the dumpster, the wall was one block's height, or approximately one foot, above the gravel lot. This additional height permitted a patron attempting to reach the top of the dumpster from the gravel lot to approach more closely by stepping onto the wall. The height of the wall dropped gradually on the right side in a stair-step fashion as the gravel lot sloped down gradually to the level of the dumpster. There were no caution signs, yellow paint, or railing in the area of the dumpster or wall.

On the day of the accident, the dumpster was almost full with some capacity remaining along the sides. Testimony differed regarding whether Mr. Ebitt told Ms. Huskey to insert her items at the right side of the dumpster where the cinder-block wall began to descend. Mr. Ebitt removed a few items from Ms. Huskey's truck as she was unloading. With her consent, he took a heater and walked with it to the scrap metal pile, from where he could no longer see Ms. Huskey. After Mr. Ebitt stepped away, Ms. Huskey lifted an empty Styrofoam cooler out of her truck, stepped onto the wall, and threw the cooler into the

dumpster. Continuing to hold the dumpster with one hand, she used her other hand to mash the cooler down into the dumpster. She then turned on her right foot while attempting to place her left foot at the point where the cinder-block wall height was lower. Losing her balance, she fell approximately four feet onto the concrete slab.

Ms. Huskey suffered a compound fracture to her left arm. The brachial artery in her left arm was pierced by the fractured bone. Mr. Ebitt came to her aid, applying a tourniquet to stop the bleeding. Ms. Huskey was transported by ambulance to the Rhea Medical Center, where the decision was made to transfer her immediately to Erlanger Hospital in Chattanooga ("Erlanger") by air ambulance. She underwent emergency surgery at Erlanger that evening. Her orthopedic surgeon, Dr. Jason Todd Hutchison, testified by deposition that during the surgery, he attached to Ms. Huskey's arm an external fixator, consisting of eight pins drilled into her bones and several connecting bars, to keep the arm stabilized. A vascular surgeon was called in to repair Ms. Huskey's severed brachial artery. Ms. Huskey was hospitalized for five days after the surgery and was released with the external fixator in place.

The external fixator was removed on November 24, 2004, approximately six weeks after the injury occurred, through a second surgical procedure. During this initial recuperation period, Ms. Huskey could not walk upstairs to the Huskeys' bedroom. Consequently, she slept downstairs on the sofa. She needed assistance with basic hygiene and all daily activities. Ms. Huskey testified that she suffered considerable pain, for which she took prescribed pain relievers. She participated in two courses of physical therapy, the first from November 2004 through February 2005, and the second from August 2005 through November 2005. After the external fixator was removed, Ms. Huskey wore a cast for several weeks. In August 2005, she underwent surgery on her left hand to restore range of motion in her left wrist. Through deposition testimony, Dr. Hutchison noted permanent damage to Ms. Huskey's left arm, explaining that she would not be able to fully straighten her elbow or rotate her palm upward. By reason of the accident, her left arm remained permanently shorter than her right arm.

Ms. Huskey's daily activities were restricted until she recovered from the August 2005 hand surgery. Her recovery involved wearing a soft cast and participating in physical therapy until November 2005, slightly over a year after the injury occurred. During several months of that year of rehabilitation, she could not drive or perform household chores. Mr. Huskey testified that he assumed all caregiving chores for the couple's pets. He performed general household chores while also helping Ms. Huskey with her personal needs.

The Huskeys had been married forty years when the final judgment was entered. At the time of the accident, Mr. Huskey was a brick mason and pastor of the Texas Grove Baptist Church. He continued to work as a brick mason through 2009 but became a full-time

pastor thereafter. Ms. Huskey was not employed outside the home at the time of the accident. Following her initial recovery, she was employed by Southeast Tennessee Human Resource Agency ("SETHRA") from December 2005 through January 2007. In her position with SETHRA, she performed clerical tasks and drove a bus transporting elderly and disabled clients. She left her employment with SETHRA to begin working full time at Mr. Huskey's church. In the intervening years between her initial recovery and the trial, Ms. Huskey taught Sunday school and served as the church pianist. She also continued with her hobbies, including sewing.

On October 4, 2005, the Huskeys filed this negligence action against the County in accordance with the Governmental Tort Liability Act. *See* Tenn. Code Ann. §§ 29-20-201 to -207 (2010). The County filed its answer nearly four years later on August 25, 2009.[1] The Huskeys moved to bifurcate the trial so as to separate the issue of liability from that of compensatory damages. The trial court granted the motion and heard evidence regarding liability on August 26, 2009, entering its order finding both parties negligent and allocating 51% fault to the County and 49% to Ms. Huskey on June 25, 2011. After a separate trial held August 23, 2012, the trial court determined total damages of $298,376.65 for Ms. Huskey's personal injury and $25,000.00 for Mr. Huskey's loss of consortium. The court entered its final judgment on October 17, 2012, awarding Ms. Huskey 51% of the compensatory damages, or $152,172.09, and Mr. Huskey 51% of the loss of consortium damages, or $12,750.00. The County timely appealed.

## II. Issues Presented

On appeal, Rhea County presents three issues, which we have restated as follows:

1.      Whether the trial court erred in finding the County liable for negligence.

2.      Whether the trial court erred in allocating less than fifty percent of the fault for Ms. Huskey's injury to her own negligence.

3.      Whether the trial court erred by awarding excessive compensatory damages to Ms. Huskey for her personal injury and to Mr. Huskey for his loss of consortium.

---

[1]The record provides no explanation for this delay.

## III. Standard of Review

Our review of the trial court's judgment following a non-jury trial is *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). This standard of review is the same for allocation of fault in bench trials. *Lindgren v. City of Johnson City*, 88 S.W.3d 581, 584 (Tenn. Ct. App. 2002) (citing *Cross v. City of Memphis*, 20 S.W.3d 642 (Tenn. 2000)). "In order for the evidence to preponderate against the trial court's finding of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). We review the trial court's conclusions of law *de novo* with no presumption of correctness. *Hughes v. Metro. Gov't of Nashville & Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

## IV. Premises Liability

Rhea County contends, *inter alia*, that Ms. Huskey failed to prove that the County was negligent in its operation of the Convenience Center. The Huskeys contend that the trial court properly weighed the evidence in finding both parties negligent and in allocating greater fault to the County than to Ms. Huskey. After a thorough review of the record, we agree with the Huskeys.

Tennessee courts recognize that the elements needed to establish a claim of negligence are:

1. a duty of care owed by defendant to plaintiff;
2. conduct below the applicable standard of care that amounts to a breach of that duty;
3. an injury or loss;
4. cause in fact; and
5. proximate, or legal, cause.

*McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). Governmental entities, such as the County in this action, possess sovereign immunity from lawsuits except as they consent to be sued. *See Hawks v. City of Westmoreland*, 960 S.W.2d 10, 14 (Tenn. 1997). The Governmental Tort Liability Act ("GTLA"), codified in 1973, governs claims against counties and other local government agencies, providing for circumstances when sovereign

-5-

immunity is removed.[2]  *See* Tenn. Code Ann. §§ 29-20-201 to -207; *Lucius v. City of Memphis*, 925 S.W.2d 522, 525 (Tenn. 1996).  Except for those circumstances provided under the GTLA, governmental entities are immune from suit for any injury resulting from the entities' activities while engaged in the "exercise and discharge" of their functions.  Tenn. Code Ann. § 29-20-201(a).

The GTLA "codifies the common law obligations of owners and occupiers of property embodied in premises liability law."  *See Lindgren*, 88 S.W.3d at 584.  These obligations include an affirmative duty of care to "protect against dangers of which one knows or which, with reasonable care, might discover."  *Id.*  "Because of their superior knowledge of the condition of the premises, owners and occupiers of property, including owners and occupiers of public property, owe persons lawfully on their property the duty of reasonable care under all the circumstances."  *Sears v. Metro. Nashville Airport Auth.*, No. 01A01-9703-CV-00138, 1999 WL 536341 at *4 (Tenn. Ct. App. July 27, 1999) (citing *McCormick v. Waters*, 594 S.W.2d 385, 387 (Tenn. 1980); *Jones v. Exxon Corp.*, 940 S.W.2d 69, 71 (Tenn. Ct. App. 1996)).

Pertinent to the instant action, the GTLA provides:

(a) Immunity from suit of a governmental entity is removed for any injury caused by the dangerous or defective condition of any public building, structure, dam, reservoir or other public improvement owned or controlled by such governmental entity.

(b) Immunity is not removed for latent defective conditions, nor shall this section apply unless constructive and/or actual notice to the governmental entity of such condition be alleged and proved in addition to the procedural notice required by § 29-20-302.

Tenn. Code Ann. § 29-20-204.  Except for specific circumstances not applicable to this action, governmental immunity is also removed for "injury proximately caused by a negligent act or omission of any employee within the scope of his employment."  *See* Tenn. Code Ann. § 29-20-205.

Summarizing, this Court has identified four elements required for successful premises liability claims against local governmental entities:

---

[2]Claims against the State are governed by the Tennessee Claims Commission Act.  *See* Tenn. Code Ann. §§ 9-8-301 to -407; *Mullins v. State*, 320 S.W.3d 273, 278 (Tenn. 2010).

(1)     proof that the governmental entity owns and controls the premises where the injury occurred;

(2)     proof that a dangerous or defective condition, or in the case of sidewalks and streets an unsafe condition, caused the injury;

(3)     proof that the governmental entity had "constructive and/or actual notice" of the condition; and

(4)     proof that the governmental entity breached its duty either to remove or eliminate the dangerous condition or to provide adequate warnings of the condition's existence.

*Sears*, 1999 WL 536341 at *5 (citing Tenn. Code Ann. §§ 29-20-203(b), -204(b); *Burgess v. Harley*, 934 S.W.2d 58, 63 (Tenn. Ct. App. 1996)).

### A.  Ownership and Control of the Premises

The first element of a premises liability claim is satisfied in the present case in that the County maintained undisputed ownership and control of the Convenience Center where Ms. Huskey's injury occurred.  Mr. Ebitt's testimony further established that the Center was enclosed by a fence with a locked gate, allowing the public access only when the Center was open and operational.

### B.  Existence of a Dangerous Condition

The County contends that the Huskeys presented insufficient evidence of a dangerous condition at the Center because no expert witness testified regarding such a condition.  We note that no expert testimony is required to prove a dangerous condition under the GTLA when some competent evidence of a hazard exists.  *See* Tenn. Code Ann. § 29-20-204; *see, e.g., Sears*, 1999 WL 536341 at *6 (determining sufficient proof of a dangerous condition without expert testimony to that effect and noting that the "very manner" in which the plaintiff was injured provided an indication of the danger).

In its ruling from the bench on the issue of liability, the trial court stated[3]:

Well, I think there's a, there's some fault on both sides of this case.  This is truly a comparative fault case, and we have comparative fault in Tennessee.  A clear day, a somewhat obvious danger but, you know, not completely obvious, you know.

---

[3]Although the transcript for the liability proceeding states that it was heard by a different judge, it has been brought to this Court's attention by the trial court that Judge Graham presided over the entire trial.

-7-

So I'm just going to find that the condition was more important than, than her failure to observe but not much more important. So 51 percent fault to the County and 49 percent fault to her, so that she can at least recover some of her injuries. I think that's about fair in all things considered.

It should've been corrected. The County should've been able to anticipate that something like this could happen, and it did happen. It took a long time for it to happen.

The trial court found that the design and placement of the dumpster and wall at the Center presented a "somewhat obvious" danger. Testimony and photographs admitted at trial demonstrated that the only access Center patrons had to the dumpster was from the gravel lot below. Using the cinder-block wall for standing provided patrons greater elevation toward the top of the dumpster and the only opening for placing refuse. The record is silent regarding whether the County designed the wall higher than the gravel lot with the intention of offering a step up to the dumpster, but such an effect of the wall's design should have been clear regardless of the intention. The only alternative means of reaching closer to the dumpster's opening, as suggested by Mr. Ebitt at trial, was for Ms. Huskey to have stood on her truck bed in close proximity of the dumpster.

By its construction, the wall was of even height at its center. On the right side, the height of the wall descended in a stair-step fashion so that one who stood in such area of the wall encountered the risk of inadvertently attempting to step too far to the right where the wall's height was lower. The acute severity of Ms. Huskey's injury, which is not in dispute, also speaks to the inherent danger of maneuvering on an uneven wall some four feet above the concrete slab below. The record contains competent evidence from which a reasonable fact-finder could conclude that the cinder-block wall constituted a dangerous condition.

## C. Notice

The County further contends that no evidence was presented to show it had received actual or constructive notice of a dangerous condition because no proof was entered of any previous falls, injuries, or complaints regarding Center conditions. The Huskeys assert that no additional proof of notice was required to establish premises liability because the County created the dangerous condition in that it built, maintained, and controlled the Center. We agree with the Huskeys.

This Court has summarized the principles governing the requirement of actual or constructive notice in premises liability claims, including those against governmental entities under the GTLA, as follows:

The requirement of actual or constructive notice reflects the understanding that a property owner's duty stems from its superior knowledge of the condition of the premises. The proof of actual or constructive notice may take two forms. First, actual knowledge can be proved by demonstrating that the owner or occupier, or an agent of the owner or occupier, was responsible for causing or creating the condition. Second, if the owner or occupier, or their agent, did not cause or create the condition, constructive notice can be proved by demonstrating that the condition existed for a sufficiently long length of time that the owner or occupier, or their agent, in the exercise of reasonable care, should have become aware of the condition. *See Martin v. Washmaster Auto Ctr., U.S.A.,* 946 S.W.2d 314, 318 (Tenn. Ct. App. 1996). This court has applied these principles in premises liability cases brought under the Tennessee Governmental Tort Liability Act. *See McCorkle v. County of Dyer*, No. 02A01-9701-CV-00020, 1998 WL 155437, at *2-3 (Tenn. Ct. App. Apr. 6, 1998) (Tenn. R. App. P. 11 application dismissed); *Wilson v. City of Lebanon*, No. 01A01-9110-CV-00353, 1992 WL 279863, at *2 (Tenn. Ct. App. Oct. 14, 1992) (No Tenn. R. App. P. 11 application filed).

*Sears*, 1999 WL 536341 at *5.

The County does not dispute that it constructed the Center and was responsible for the design of the area surrounding the large dumpster where Ms. Huskey fell, including the cinder-block wall and concrete slab. Mr. Ebitt testified that the County built the Center in 1984 and that the equipment in place at the time of the accident had been there for approximately ten years. Having concluded that the trial court did not err in finding a dangerous condition, we must also conclude that the County had actual notice because the County created the condition. *See id.* The County's position, which is essentially that longstanding operation with no proof of prior injuries or complaints equates to an absence of notice, is unavailing. *See, e.g., Elkins v. Hawkins County*, No. E2004-02184-COA-R3-CV, 2005 WL 1183150 at *6 (Tenn. Ct. App. Apr. 5, 2005) (holding that "the county is chargeable with notice of that which it constructed" where a combined design of restroom door threshold height and dim lighting were determined to be a dangerous condition).

### D. Breach of Duty

The County owed an affirmative duty to protect the Center's invitees against a dangerous condition of which the County had notice. *See Lindgren*, 88 S.W.3d at 584. This duty can be attributed to the County, however, only if the potential danger of the condition to invitees was foreseeable. *See Coln v. City of Savannah*, 966 S.W.2d 34, 43 (Tenn. 1998),

*overruled on other grounds by Cross v. City of Memphis*, 20 S.W.3d 642 (Tenn. 2000). As our Supreme Court has stated:

> Foreseeability is the test of negligence. If the injury which occurred could not have been reasonably foreseen, the duty of care does not arise, and even though the act of the defendant in fact caused the injury, there is no negligence and no liability. *See Spivey v. St. Thomas Hospital*, 31 Tenn. App. 12, 211 S.W.2d 450, 456 (1948). "[T]he plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility, and that some action within the [defendant's] power more probably than not would have prevented the injury." *Tedder [v. Raskin]*, 728 S.W.2d [343], 348 [(Tenn. Ct. App. 1987)].

*Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992).

In determining that the trial court properly found the design and placement of the dumpster and cinder-block wall to be a dangerous condition, we have described the danger in providing an uneven wall as a potential stepping-up and standing location for one to reach the opening of a dumpster approximately four feet above the only access point provided, the gravel lot. This danger was exacerbated by the fact that, as shown by photographs admitted into evidence, a patron losing her footing on the uneven portion of the wall had no barrier to prevent a fall upon the concrete slab approximately four feet below. The County, through Mr. Ebitt's testimony and in its appellate brief, asserted that patrons often stood in their truck beds to achieve a closer reach to the dumpster's opening. This argument ignores the fact that not every patron of the Center operates a truck or, if driving a loaded truck, would have sufficient space to stand in the truck bed when first unloading. Mr. Ebitt testified that he knew patrons used the wall to step up to the dumpster and that he did not issue warnings to stay off the wall.

In support of its position, the County again relies in great part on the fact that the Center had been used since 1984 with no known prior injuries or complaints. This fact does not negate the foreseeability of a patron falling while using the cinder-block wall; instead, it highlights the trial court's conclusion that "[t]he County should've been able to anticipate that something like this could happen, and it did happen. It took a long time for it to happen." *See, e.g., Hamby v. State*, No. W2002-00928-COA-R3-CV, 2002 WL 31749450 at *5 (Tenn. Ct. App. Dec. 4, 2002) ("The fact that no one was injured prior to [the plaintiff] falls under the auspices of luck and cannot be the basis for relieving [the defendant] of a clear duty."). We determine that the trial court did not err in finding the probability of a patron falling and becoming injured while using the cinder-block wall for unloading refuse foreseeable.

As the owner of the Center, the County could have discharged its affirmative duty to keep the Center premises safe either by (1) removing or eliminating the dangerous condition or (2) warning persons lawfully on the property of the existence of the dangerous condition. *See Broome v. Parkview, Inc.*, 359 S.W.2d 566, 568 (Tenn. Ct. App. 1962); *see also Sears*, 1999 WL 536341 at *4. It is undisputed that the County took no action to remove or eliminate the dangerous condition prior to Ms. Huskey's injury. It is also undisputed that the County placed no type of warning around the dumpster or cinder-block wall. *See Sears*, 1999 WL 536341 at *7 (noting that when removing a dangerous condition is not an option, the duty implicated is the duty to warn). The evidence does not preponderate against the trial court's finding that the County breached its duty of care to eliminate or warn against a dangerous condition of which it had notice.

## E. Causation

The County also contends that the trial court erred in finding the County negligent because the Huskeys failed to prove that the design and placement of the dumpster and adjacent cinder-block wall constituted a cause in fact and proximate cause of Ms. Huskey's fall and resulting injury. The County specifically argues that the Huskeys were unable to present sufficient proof of causation without testimony from an expert witness regarding the construction of the wall and the danger of falling from it. We disagree.

It is well settled that a negligence claim requires proof of both causation in fact and proximate cause. *Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005). "Causation [in fact] and proximate cause are distinct elements of negligence, and both must be proven by the plaintiff by a preponderance of the evidence." *Id.* (quoting *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993)). As our Supreme Court has explained:

> The defendant's conduct is the cause in fact of the plaintiff's injury if, as a factual matter, it directly contributed to the plaintiff's injury. In a case such as this one, we must ask whether the plaintiff's injury would have happened "but for" the defendants' act. *See Wood v. Newman, Hayes & Dixon Ins. Agency*, 905 S.W.2d 559, 562 (Tenn. 1995). If not, then the defendants' conduct is a cause in fact of the plaintiff's injury. It is not necessary that the defendants' act be the *sole* cause of the plaintiff's injury, only that it be *a* cause.

*Hale*, 166 S.W.3d at 718.

"Causation questions are fact-sensitive and require that the evidence be reviewed in light of logic, common sense, policy, and precedent." *Burgess v. Harley*, 934 S.W.2d 58, 69

(Tenn. Ct. App. 1996).  Contrary to the County's assertion, expert proof of causation is not required when specialized skills are not needed to understand the cause of an accident.  *See, e.g., Jones* v. *Shelby County Div. of Corrs* , No. W2007-00198-CPA–R3-CV, 2008 WL 366151 at *5 (Tenn. Ct. App. Feb. 12, 2008) ("[T]he question of what caused the ventilation system to fall [injuring plaintiffs] is a judgment that does not require specialized skills, or information that an ordinary person would not possess.  Rather, common sense dictates the finding in this case.").

The County further argues that Ms. Huskey did not consistently blame the uneven cinder-block wall for her fall because she initially testified in deposition that she "lost her footing and fell" and at trial maintained that the cinder-block wall was the cause of her fall.  Ms. Huskey also testified during trial that she "pivoted" on her right foot before attempting to place her left foot where there was no block on the descending portion of the wall.  When cross-examined on this point, Ms. Huskey acknowledged that she had used the word "twirled" during her deposition testimony in describing how she had turned.  We first note that the trial court is afforded great deference in determining the credibility of witnesses and that the trial court's judgment gave every indication of finding Ms. Huskey credible.  *See Cannon v. Loudon County*, 199 S.W.3d 239, 241-42 (Tenn. Ct. App. 2005).  This being acknowledged, we also note that the semantic differences among Ms. Huskey's statements regarding how she turned and how she came to find no secure surface for her left foot are immaterial to causation.  The undisputed facts evince that Ms. Huskey was injured when she fell from an uneven wall onto a concrete slab while attempting to place a refuse item in a dumpster, the opening of which was several feet above her head.  The County's breach of duty in creating a dangerous condition and then failing to eliminate or warn against said condition was a cause in fact of Ms. Huskey's injury.

Having determined that Ms. Huskey's injuries would not have happened but for the County's breach of duty, we turn to whether the County's breach was a proximate cause of Ms. Huskey's injuries.  *See Hale*, 166 S.W.3d at 718.  As this Court has explained:

> In order to be a proximate cause of an injury, a negligent act or omission must have been a substantial factor in bringing about the injury. *Boling v. Tennessee State Bank*, 890 S.W.2d 32, 36 (Tenn. 1994); *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991).  An injury may be proximately caused by more than one negligent act or omission. *Kelley v. Johnson*, 796 S.W.2d 155, 159 (Tenn. Ct. App. 1990); *Stokes v. Leung*, 651 S.W.2d 704, 708 (Tenn. Ct. App. 1982).  Thus, a negligent act or omission need not be the sole cause of an injury to be a proximate cause. *McClenahan v. Cooley*, 806 S.W.2d at 775; *Lancaster v. Montesi*, 216 Tenn. 50, 57, 390 S.W.2d 217, 221 (1965).  Each person whose negligence is a proximate cause of an injury may

-12-

be independently liable for the injury. *McClenahan v. Cooley*, 806 S.W.2d at 775.

*Burgess*, 934 S.W.2d at 68; *see also Hale*, 466 S.W.3d 713, 719 (delineating a three-part test for proximate cause, including (1) the tortfeasor's conduct as a substantial factor in bringing about the injury, (2) no rule or policy relieving the wrongdoer from liability, and (3) reasonable foreseeability of the harm).

The County could have taken measures to eliminate the dangerous condition. The County failed to take any such steps and failed to warn patrons of the danger. Having concluded that the probability of a patron falling and becoming injured while using the cinder-block wall was reasonably foreseeable and that the County breached its duty of affirmative care, we further conclude that the County's breach was a substantial factor in bringing about Ms. Huskey's injuries and as such, constituted a proximate cause of said injuries. The evidence does not preponderate against the trial court's finding that the County was liable in negligence for Ms. Huskey's injuries pursuant to the GTLA.

## IV. Allocation of Fault

The County next contends that the trial court erred by not finding Ms. Huskey at least 50% at fault for her injury, thereby barring her from recovery. The trial court specifically found Ms. Huskey negligent for her "failure to observe," presumably her failure to observe what the court termed the "somewhat obvious" danger of using the uneven wall for elevation and how her feet were placed on it. The Huskeys posit that the trial court properly allocated fault and do not contest the trial court's allocation of 49% fault to Ms. Huskey. We conclude that the trial court properly allocated fault.

In support of its contention, the County emphasizes the undisputed facts that Ms. Huskey was familiar with the Center and chose to visit the Center near closing time when the dumpster would be close to capacity. The County also asserts that Ms. Huskey voluntarily chose to place items in the dumpster from the right side of the cinder-block wall at a point where its height descended by design. Mr. Ebitt testified that Ms. Huskey backed her truck to the dumpster and began unloading items into the right portion without specific instruction to do so. By his account, the dumpster was at approximately two-thirds capacity when Ms. Huskey arrived.

The Huskeys argue that Mr. Ebitt acted negligently within the scope of his employment by specifically directing Ms. Huskey to unload her truck at the right side of the dumpster and by not warning her to stay off the cinder-block wall. Ms. Huskey testified that Mr. Ebitt directed her to the right side of the dumpster, explaining that she would need to

-13-

return the next day unless she could place her items in the container's open space on that side. She acknowledged she could have returned the next day with her load. Mr. Ebitt indicated that he unloaded some items out of Ms. Huskey's truck and admitted he did not warn her to stay off the cinder-block wall. Mr. Ebitt and Ms. Huskey both said they had known each other most of their lives. Mr. Ebitt volunteered that Ms. Huskey enjoyed a fine reputation in the community.

As noted above, the trial court is in the best position to assess witness credibility and is owed great deference in this regard. *See Cannon*, 199 S.W.3d at 241-42. In addition, a "trial court has considerable latitude in allocating fault between or among culpable parties, and the appellate court reviews same with a presumption of correctness." *Lindgren*, 88 S.W.3d at 585 (citing *Coln*, 966 S.W.2d at 44).

The Tennessee Supreme Court adopted the system of modified comparative fault in *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992), with the intention, *inter alia*, of replacing the doctrine of contributory negligence with a set of principles that would more fairly allocate liability and enable plaintiffs to recover fully from their injuries. *See Grandstaff v. Hawks*, 36 S.W.3d 482, 490 (Tenn. Ct. App. 2000). Under the modified system, a plaintiff may only recover damages if the "plaintiff's negligence remains less than the defendant's negligence," and the "plaintiff's damages are to be reduced in proportion to the percentage of the total negligence attributable to the plaintiff." *McIntyre*, 833 S.W.2d at 57. In a case such as the one at bar where the negligence of one tortfeasor and of the plaintiff were each found to be a proximate cause of the plaintiff's injury, the specific applicable doctrine is one of "comparative negligence." *See Grandstaff*, 36 S.W.3d at 491 n.12. As this Court explained in *Grandstaff*:

> The Tennessee Supreme Court has distinguished between "comparative negligence" and "comparative fault." *See Coln v. City of Savannah*, 966 S.W.2d at 40 n. 6; *Owens v. Truckstops of Am.*, 915 S.W.2d at 425-26 n. 7. Comparative negligence measures the plaintiff's negligence for the purpose of reducing the plaintiff's recovery. Comparative fault encompasses the allocation of recovery among multiple or joint tortfeasors according to their percentage of fault. The Court made this distinction on the theory that a plaintiff's recovery may only be reduced because of the plaintiff's negligence, whereas a defendant's liability may be based on theories of liability other than negligence, for example, strict liability. *Owens v. Truckstops of Am.*, 915 S.W.2d at 426 n. 7.

*Id.*

Our Supreme Court has provided the following factors to be considered in allocating fault:

> In summary, the percentage of fault assigned to each party should be dependent upon all the circumstances of the case, including such factors as: (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as an attempt to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.

*Eaton v. McClain*, 891 S.W.2d 587, 592 (Tenn. 1994).

While not addressing these factors directly, the trial court alluded in its ruling from the bench to (1) the closeness of the causal relationship between the County's conduct in creating and maintaining a dangerous condition and Ms. Huskey's injury, (2) the reasonableness of Ms. Huskey's conduct in confronting the risk of using the uneven wall, and (3) the extent to which the County failed to reasonably utilize existing opportunities to "correct" the dangerous condition. We note also that the trial court termed the danger "somewhat obvious" and that this characterization can implicate both the defendant and the plaintiff. As we have determined above, the County owed an affirmative duty to eliminate or warn of the dangerous condition. Because it also should have been somewhat obvious to Ms. Huskey that standing on the uneven wall to reach the dumpster could cause her to fall, the trial court properly found her negligent in confronting the risk.

Even where the danger may be considered obvious, however, Ms. Huskey's decision to use the wall does not negate the County's duty to protect her from the danger. As our Supreme Court has held:

> That a danger to the plaintiff was "open or obvious" does not, *ipso facto*, relieve a defendant of a duty of care. Instead, the duty issue must be analyzed with regard to foreseeability and gravity of harm, and the feasibility and availability of alternative conduct that would have prevented the harm.

*Coln*, 966 S.W.2d at 43. Applying the principles we have cited to our review of the record as a whole, along with our determination that the County breached its duty to protect patrons

-15-

such as Ms. Huskey from a dangerous condition it created, we determine that the evidence does not preponderate against the trial court's allocation of fault.

## VI.  Compensatory Damages

## A.  Personal Injury Damages

The County contends that the aggregate award of compensatory damages to Ms. Huskey for her personal injury and to Mr. Huskey for loss of consortium was excessive and not supported by the evidence.  We disagree.

The trial court itemized the damages as follows:

| | |
|---|---|
| Stipulated medical expenses: | $  78,376.65 |
| Past pain and suffering: | $100,000.00 |
| Present and future pain and suffering: | $  50,000.00 |
| Permanent disfigurement and scaring: | $  20,000.00 |
| Loss of enjoyment of life & permanent injuries: | $  50,000.00 |
| Total Injury Damages: | $298,376.65 |
| Loss of Consortium: | $   25,000.00 |

Pursuant to its findings of comparative negligence, the court awarded 51% of the damages for her personal injury to Ms. Huskey and 51% of the damages for loss of consortium to Mr. Huskey.  *See Lindgren*, 88 S.W.3d at 585 ("The trier of fact . . . should first determine the total amount of the plaintiff's damages without regard to fault, and then apportion damages on the percentage of fault attributable to each tortfeasor").  Whether the trial court has used the proper measure of damages is a question of law, which we review *de novo*, but the actual amount of damages awarded, provided within the limits ascribed by law, is a question of fact, which we review with a presumption of correctness.  *Beaty v. McGraw*, 15 S.W.3d 819, 829 (Tenn. Ct. App. 1998); *see* Tenn. R. App. P. 13(d).  In non-jury cases, "we will alter the amount of damages only when the trial court has adopted the wrong measure of damages or when the evidence preponderates against the amount of damages awarded."  *Beaty*, 15 S.W.3d at 829.

The County does not dispute the awards for medical expenses and permanent disfigurement. Conversely, the County does dispute the assessment of $100,000 for past pain and suffering, $50,000 for present and future pain and suffering, and $50,000 for loss of enjoyment of life and permanent injuries.  The County primarily argues that Ms. Huskey is

now healed from her injuries and that her ability to (1) work assisting elderly persons entering and exiting a van, (2) serve as a church pianist, and (3) enjoy her hobby of sewing provide sufficient proof she does not have permanent injuries. The County emphasizes that no doctor has placed restrictions regarding Ms. Huskey's activities since she was released from her first course of post-operative treatment in April 2005. The County acknowledges in its appellate brief that Ms. Huskey "sustained physical pain" but asserts that no proof was introduced "as to any future physical pain and suffering" or "past, present or future mental distress."

Ms. Huskey testified that when she fell, she saw an "humongous bone just sticking up and blood gushing everywhere," and she felt pain "like there was a huge vise squeezing the fire out of [the arm] and it wanted to blow up or something and burn." Mr. Huskey added that when he arrived at the Center while emergency workers were still treating his wife, he heard her screaming with pain until she was transported. Ms. Huskey remembered waking from emergency surgery with external hardware on her extremity, including eight pins screwed into her arm's bones and affixed to the hardware. While in the hospital, she could not get out of bed and was prescribed a morphine pump to use as needed for the pain.

The external fixator remained on Ms. Huskey's arm until it was removed during a November 24, 2004 surgery. Ms. Huskey testified that while she wore the external fixator, she could not go upstairs and slept downstairs on a sofa. She needed assistance with her personal hygiene and wrapped her arm in plastic to avoid getting it wet due to the risk of infection. Ms. Huskey related that friends from the church occasionally came into her home and provided assistance. More often, however, Mr. Huskey helped her shower and dress. She suffered constant pain, could not bend her fingers, and "carried" her arm on a pillow to support it.

After the external fixator was removed, Ms. Huskey wore a soft cast on her arm for several weeks. She underwent physical therapy from November 2004 through February 2005 and required pain medication before each session to withstand the stretching and squeezing as the therapist worked to improve range of motion. She underwent additional hand surgery in August 2005 to have a bone shaved so that her wrist could supinate, or rotate up. A second course of physical therapy followed. Ms. Huskey testified that she was not able to drive or perform household chores until approximately September 2005. She was told by doctors to be careful but was not assigned actual restrictions on her activities.

As for permanent injury, in addition to the disfigurement of scarring, Ms. Huskey testified that her left arm was shorter than her right arm, that she could not flatten her left hand, and that she could not rotate her left palm upward. She complained of pain performing any task that consisted of twisting or turning, indicating she could not hold anything for a

sustained period. Relative to playing the piano, she could no longer stretch to reach the lower notes. She experienced hand pain when she operated a vehicle so that she could not drive for more than an hour at a time. She had a disabled grandchild whom she had difficulty holding and giving the special care he needed. At the time of trial, she said she took only over-the-counter pain medication, although the pain still prevented her from sleeping at times.

Ms. Huskey explained that when she worked for SETHRA from December 2005 through January 2007, she performed clerical duties in the office and drove a "bus" with automatic transmission to transport elderly and disabled clients. She typically sat while patrons boarded or exited the bus, using a hydraulic lift for those with wheelchairs, which she operated with a button. She acknowledged sometimes physically assisting clients by scooting them with her knee and clamping down with her right hand. She knew of no job restrictions recorded in her personnel file because of her injury.

Ms. Huskey testified that since leaving her position at SETHRA, she had worked full-time at her husband's church. She sometimes drove aging parishioners to doctors' appointments. On one occasion, she balanced a parishioner attempting to stand after surgery. At the time of trial, she taught Sunday school and vacation Bible school, served as the church pianist, and washed dishes for occasional dinners. She could not sew for long periods because the pain kept her from holding materials more than a few minutes.

At trial, the deposition testimony of Ms. Huskey's orthopaedic surgeon, Dr. Jason Todd Hutchison, was admitted into evidence. Dr. Hutchison testified that he was affiliated with University Orthopedics in Chattanooga and had privileges at Erlanger in 2004. On October 6, 2004, he initially treated Ms. Huskey in the emergency department and then performed emergency surgery on her left arm to repair an open fracture at the wrist and complex dislocation at the elbow. While in surgery, the medical team noted that Ms. Huskey's brachial artery had been torn, with collateral blood flow around the elbow keeping her left hand "survivable and alive." Dr. Hutchison requested the assistance of a vascular surgeon, who repaired the torn artery after the orthopaedic work was complete.

Dr. Hutchison described the injury and repair procedure as follows:

[W]e proceeded with washing out the wounds, cleaning the wounds of any gross contamination, and then placing an external fixator, which is pins and a little connecting bar in order to stabilize the fracture at the wrist. And then similarly, because the elbow, all the ligaments had been torn and it was grossly unstable, we put what's called a hand external fixator on the elbow which allows the elbow to move through a certain range of motion while keeping it

concentrically reduced allowing all the ligaments to scar in and also allowing access for the vascular services to do the arterial repair which was necessary.

Dr. Hutchison related that he saw Ms. Huskey daily in the hospital following the surgery, in his office on October 14, 2004, and monthly through December 17, 2004. He also performed surgery to remove the external fixator from Ms. Huskey's arm on November 24, 2004. He remembered her "having trouble with motion and–in her wrist, elbow, and to some degree in her hand, which, again, is not necessarily unanticipated given the severity of her injuries." He became concerned that Ms. Huskey was having some symptoms of "mild reflex sympathetic dystrophy or some kind of dystrophy because of the stiffness in her fingers and hands."

In January 2005, Dr. Hutchison left Chattanooga to relocate his practice and assigned Ms. Huskey's care to one of his associates, Dr. Adam Smith. Before referring Ms. Huskey to Dr. Smith, Dr. Hutchison last examined her on December 17, 2004, when he noted reduced range of motion in her left elbow, "significant limitations of supination" in her forearm, and some limitation of motion in her wrist. He also noted an ulnar positive deformity at that time, which he articulated meant her fracture in the radial side had shortened somewhat, tilting the wrist to one side.

Dr. Hutchison reviewed Dr. Smith's records from Ms. Huskey's subsequent treatment and summarized that when Dr. Smith examined her on April 5, 2005, his findings showed little difference clinically from the December 2004 examination. Dr. Hutchison testified that based on his training, education, examination, and treatment of Ms. Huskey from October 2004 through December 2004, as well as his review of Dr. Smith's records from January 2005 through April 2005, he would expect Ms. Huskey's "limitations of motion in her elbow, forearm, and wrist" to be permanent. When asked if the result of treatment was a success, Dr. Hutchison opined, "[W]e saved a life, we saved the limb, and we maintained some function, but it's not a functionally normal limb . . . ." He acknowledged that he had not examined Ms. Huskey for the purpose of identifying permanent impairment.

The damages for Ms. Huskey's injury in dispute on appeal–(1) past pain and suffering, (2) present and future pain and suffering, and (3) loss of enjoyment of life and permanent injuries–are non-economic damages that "can be encompassed within the general rubric of pain and suffering." *See Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 715 (Tenn. Ct. App. 1999). Damages for a permanent injury and for loss of enjoyment of life, however, represent "separate and distinct losses to the victim" apart from general pain and suffering. *Id.* In assigning amounts to the damages assessed, the trial court classified the assessment for Ms. Huskey's past pain and suffering, leading up to the day of trial, separately from the

assessment for her present and future pain and suffering.  The court combined damages for loss of enjoyment of life and permanent injuries into one amount.

### 1.  Pain and Suffering

Pain and suffering "encompasses the physical and mental discomfort caused by an injury" and "includes the 'wide array of mental and emotional responses' that accompany the pain, characterized as suffering, such as anguish, distress, fear, humiliation, grief, shame, or worry." *Overstreet*, 4. S.W.3d at 715 (quoting *McDougald v. Garber*, 132 Misc.2d 457, 504 N.Y.S.2d 383, 385 (N.Y. Sup. Ct. 1986)) (other internal citations omitted).   In its Memorandum Opinion, incorporated into the final judgment, the trial court stated:  "The testimony of the medical proof, the photographs, and the testimony of the witnesses, including Mr. Huskey's testimony about [Ms. Huskey's] screams and so forth, make it clear that this was a very severe injury when it comes to pain and suffering."  We agree.

Regarding past pain and suffering, the County acknowledges that Ms. Huskey "sustained physical pain" but asserts that no proof was offered as to any past mental distress, apparently arguing that the award for past pain and suffering was excessive because Ms. Huskey suffered only physically.  An immediately apparent fallacy in this argument is the proposition that the wide array of responses to severe pain and physical suffering would include no mental or emotional ramifications.  As noted by this Court in *Overstreet*, the "extreme discomfort caused by lying in a hospital bed in a leg traction device with holes punched in one's limbs is an example of the pain and suffering for which damages may be awarded."  4 S.W.3d at 715 (citing *Owen v. Locke*, 650 S.W.2d 51, 52 (Tenn. Ct. App. 1983)).

Testimony evinced that Ms. Huskey lay first in a hospital bed with holes punched in her elbow and wrist, her injuries braced by an external fixator; she later lay primarily on her sofa at home for six weeks with the same hardware, unable to bathe or dress herself and dependent on her husband and friends for daily care.  She testified that when she did walk, she "carried" her injured arm on a pillow out of fear that the torn brachial artery would not heal properly if she did not keep the extremity motionless.  Ms. Huskey's recovery period extended well into 2005, including three surgeries and physical therapy so painful that she needed pain medication to withstand the therapy.  Although Ms. Huskey did not belabor the mental effects of such pain, confinement, and dependence, that did not prevent those effects from being clearly indicated by her testimony.  The County's argument that the ramifications of such an injury and recovery period were only physical is without merit.

After assessing $100,000 in damages for Ms. Huskey's past pain and suffering, the trial court assessed half as much, $50,000, relative to Ms. Huskey's present and future pain

and suffering. The County asserts that "no proof was introduced as to any future physical pain and suffering." We disagree. The County questions whether Ms. Huskey could have driven a SETHRA bus from December 2005 through January 2007 without being fully recovered. Ms. Huskey explained that she operated the clients' wheelchair lift with a hydraulic push-button system and physically assisted clients when she could without using her left hand. As the County notes, Ms. Huskey testified that by the time of the damages portion of trial, nearly eight years after she was injured, she had resumed activities she enjoyed, including those at her church of teaching classes, helping with dinners, and serving as the church pianist. She was driving and sewing again. However, Ms. Huskey also explained that her range in playing the piano was limited by the pain and stiffness in her left hand and wrist, that she could drive for no more than an hour because of pain from holding the steering wheel, and that she could only sew for as long as she could withstand the discomfort of holding the materials.

Ms. Huskey further testified that she had learned to accommodate her injury by performing tasks "her way." This often involved difficult and frustrating adjustments, as well as the fear she would re-injure her arm. When asked to characterize her daily challenges, Ms. Huskey stated:

> Just reaching for anything I have to move my whole body more, you know, to get–and I can't–if I try to get–if I tried to reach and get something under here, I would have to get down. And it scares me to get down because I have to use my arm to push up. And I'm always afraid in the back of my mind I'm going to break it or pop it or something.

Mr. Huskey characterized his wife as "a doer" and "a worker," who "does what she can with one hand and uses that as much as she can." He also testified that not a day had passed in which Ms. Huskey was not prevented from doing something by her injury that she would otherwise have done. He explained that her arm swelled if she pushed, pulled, or lifted. She needed continuing help with household and pet care chores she had performed on her own before the injury. As summarized: "it's something that she lived with, we live with. It's a weakness, and it's a limitation."

Dr. Hutchison's testimony regarding Ms. Huskey's medical condition supported the Huskeys' description of Ms. Huskey's limitations as ongoing and painful. The evidence does not preponderate against the trial court's award of damages for pain and suffering: past, present, and future.

## 2. Loss of Enjoyment of Life and Permanent Injury

In assessing $50,000 regarding Ms. Huskey's loss of enjoyment of life and permanent injury, the trial court stated it was basing damages for loss of enjoyment of life on evidence that the injury was permanent. The court further stated:

> It's not a functionally normal–a normal limb is what the doctor says. We maintain some function, but it's not a functionally normal limb. So we can anticipate that she probably has reached whatever recovery she's going to reach, and she has limitation of motion; as set forth in that disposition. So, anyway, I say she has a permanent injury with regard to her range of motion and so forth, and that limits her enjoyment of life and the pursuits that she could have done and will do over the future and has done in the past. I'm going to set that at $50,000 for the entire period from the time of injury till the end of her life.

The court further found that "it was a horrendous injury, and she's probably lucky to be alive, and lucky to have any function in that arm."

A permanent injury is "an injury from which the plaintiff cannot completely recover," and one that "may relate to earning capacity, pain, impairment of physical function or loss of the use of a body part." *Overstreet*, 4. S.W.3d at 715. "Damages for loss of enjoyment of life compensate the injured person for the limitations placed on his or her ability to enjoy the pleasures and amenities of life." *Id.* at 715-16. Such damages may relate to "daily life activities that are common to most people" and may "compensate a victim for the loss of uncommon individual pursuits or talents." *Id.* at 716.

The County requests that this Court vacate the award for permanent injury and reduce the award for loss of enjoyment of life, asserting that Ms. Huskey's life was "impacted for a few months" but that she "seems to have completely recovered." Conversely, the trial court clearly credited Dr. Hutchison's testimony that Ms. Huskey's left arm was permanently injured in that she would never have full range of motion and would always have one arm shorter than the other. In addition, the record shows that Ms. Huskey demonstrated in court and through photographs that her injured arm was shorter than the other with a limited range of motion. Ms. Huskey testified at trial that, *inter alia*, she could not lift or fully care for her handicapped grandchild, drive for more than an hour at a time, reach the lower keys on a piano without pain, sew for an extended period, or open cans or jars. Mortality tables admitted at trial established Ms. Huskey's life expectancy at approximately twenty years from the date of trial. The evidence does not preponderate against the trial court's finding that Ms. Huskey suffered a permanent injury from which she would continue to suffer loss

-22-

of enjoyment of life, nor does the evidence preponderate against the trial court's award of respective damages.

## B. Loss of Consortium

The County contends that the evidence did not support the trial court's $25,000.00 loss of consortium assessment because the only basis for such a determination was "some extra household chores [Mr. Huskey] performed during the months before [Ms. Huskey] completely healed." The Huskeys assert that undisputed testimony presented at trial established that Mr. Huskey's life was significantly affected by the need to provide his wife with virtually constant care during the initial weeks of her recovery, to reduce his hours as a brick mason in those early weeks, to facilitate her sleeping downstairs away from the marital bedroom for several weeks, and to accommodate her ongoing need for assistance with daily tasks she once performed independently. Based on our careful review of the record, we agree.

Mr. Huskey testified that in October 2004, he typically worked overtime each week as a brick mason and that once Ms. Huskey was injured, he reduced his hours in order to care for her as much as possible. He stayed at the hospital with Ms. Huskey throughout the initial week following her injury. He said that once his wife returned home, she slept downstairs on the sofa, "couldn't do anything," and needed either him or friends to care for her "around the clock." As noted above, Mr. Huskey became responsible for multiple household and pet caretaking chores that Ms. Huskey had previously performed. Ms. Huskey did not drive for several months after the accident and needed assistance with doctor's appointments and other errands. Mr. Huskey described his current life with his wife as requiring daily accommodations for Ms. Huskey's injury. When the trial court inquired if at least during the period of recuperation, "love and affection and things like that" were "put on hold," Mr. Huskey answered in the affirmative.

Pursuant to Tennessee Code Annotated § 25-1-106 (2010), a spouse of a plaintiff who has proven damages from an injury may recover for loss of consortium. Although a claim for loss of consortium is derivative of an injury claim, it is a distinct and separate cause of action. *See McPeek v. Lockhart*, 174 S.W.3d 751, 755 (Tenn. Ct. App. 2005). This Court has defined consortium as:

> "the conjugal fellowship of husband and wife, and the right of each to the company, cooperation, affection and aid of the other in every conjugal relation" . . . loss of services is a part of the loss of consortium . . . .

*Id.* (quoting *Jackson v. Miller*, 776 S.W.2d 115, 116-17 (Tenn. Ct. App. 1989) (quoting *Manning v. Altec, Inc.*, 488 F.2d 127, 132 (6th Cir. 1973)). We conclude that the evidence does not preponderate against the trial court's award of loss of consortium damages to Mr. Huskey.

## VI. Conclusion

For the reasons stated above, the judgment of the trial court finding the County liable in negligence for Ms. Huskey's injury and apportioning 51% fault to the County and 49% fault to Ms. Huskey is affirmed. Furthermore, the judgment setting compensatory damages at $298,376.65 and awarding 51% of those damages, in the amount of $152,172.09, to Ms. Huskey, is affirmed, as is the judgment establishing loss of consortium damages at $25,000.00 and awarding 51% of those damages, in the amount of $12,750.00, to Mr. Huskey. Costs on appeal are taxed to the appellant, Rhea County, Tennessee. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE